UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| LAQUEZ FREEMON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil File Action |
| v. | * | |
| | * | Number _____ |
| XSYS NORTH AMERICA | * | |
| CORPORATION, as successor by | * | |
| merger to FLINT GROUP | * | |
| FLEXOGRAPHIC PRODUCTS LLC, | * | |
| | * | |
| Defendant. | * | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiff Laquez Freemon files this Complaint against Defendant XSYS North America Corporation, as successor by merger to Flint Group Flexographic Products LLC, and alleges as follows:

## PREAMBLE

On October 13, 2021, Laquez Freemon was seriously and permanently injured by a defective product manufactured and sold by XSYS.  At the time of his injury, Mr. Freemon was working at a production plant owned and operated by Transcontinental US LLC in Griffin, Georgia in Spalding County.  Mr. Freemon was working on a large-scale printing press when suddenly and without warning an adapter for the press manufactured by XSYS exploded in Mr. Freemon's face.  The

explosion launched a large metal piece of the adapter directly into Mr. Freemon's face and chest, knocking him unconscious, breaking his jaw and sternum, and causing extensive dental damage.  Mr. Freemon suffered permanent injuries in the blast and has not been able to return to work since the incident.

XSYS has all but admitted that it caused Ms. Freemon's injuries through its negligent design of the adapter.  After Mr. Freemon's injury, Transcontinental shut down the portion of its operations dependent on similar XSYS adapters and did not resume production until XSYS agreed to fix its improperly designed adapters and warrant that the adapters were now properly made.  The "fix" was simple—XSYS drilled two holes in the adapter piece to allow air pressure to dissipate.  That "fix" should have been part of the adapters' design when sold to Transcontinental and proves that XSYS designed and manufactured a defective product.

Mr. Freemon brings this case to recover the damages he suffered because of XSYS's defective product design.

## PARTIES, JURISDICTION, AND VENUE

### 1.

Plaintiff Laquez Freemon lives in Henry County, Georgia, and is a Georgia citizen.

2.

Defendant XSYS North America Corporation is a Delaware corporation

with its principal place of business in Michigan.  XSYS is a successor by merger to

Flint Group Flexographic Products LLC.  XSYS may be served with process

through its registered agent: CT Corporation System, 289 South Culver Street,

Lawrenceville, GA 30046.

3.

This Court has diversity subject matter jurisdiction under 28 U.S.C. § 1332

because the matter in controversy exceeds $75,000, and there is complete diversity

of citizenship between Mr. Freemon and XSYS.

4.

This Court has personal jurisdiction over XSYS because it is a foreign

corporation registered with the Georgia Secretary of State to transact business in

Georgia and because this case arises out of or relates to business XSYS transacted

in the State of Georgia.

5.

Venue is proper under 28 U.S.C. § 1391(b)(2) because this lawsuit arises out

an injury at the Transcontinental factory located in Spalding County, Georgia,

which falls within the Newnan Division of the Northern District of Georgia.

## OPERATIVE FACTS

### 6.

To understand how Mr. Freemon was injured and why XSYS is at fault requires some background information about his employer and its work.  Mr. Freemon worked for Transcontinental US LLC, a wholly owned subsidiary of Transcontinental Inc., known as TC Transcontinental.  TC Transcontinental is a multibillion-dollar, multinational corporation focused on flexible packaging, printing, and media publications.  Particularly relevant to this case is TC Transcontinental's production of flexible plastic products, including roll stock, bags and pouches, shrink films and bags, and advanced external coatings primarily for the food industry and other producers of essential goods.

### 7.

TC Transcontinental uses specialized printing presses to manufacture its flexible packaging products.  These large-scale industrial presses run several types of flexible plastic films through high-speed rollers that apply inks to print labels and other information directly on the films, thereby creating packaging for consumer goods.



A typical Transcontinental printing press.

8.

An essential component of each press is a large adapter called a "bridge." The bridge is a rigid cylindrical roller mounted laterally in the printing press. A metal shaft, or mandrel, runs through the center of the bridge and connects to mounts on the printing press. The motors on the press turn the mandrel, which rotates the bridge. A printing sleeve fits over the bridge and applies ink to rolls of flexible plastic film run through the press.



Diagram of a flexographic printing bridge and sleeve.



Diagram of the various components in a flexographic printing press.

9.

When in use, the bridge is covered by a rigid polyurethane printing sleeve, also known as a print cylinder, and a mounted printing plate used to apply ink to the plastic film.  An ink chamber fills with the desired ink and charges a porous roller, which delivers the ink to the print plate, print sleeve, and bridge assembly. The bridge assembly finally applies the ink to the plastic film as it passes around the central impression drum, as shown above.

10.

After each printing run is complete, the print sleeve is removed from the bridge and replaced with the appropriate sleeve for the next printing job.  The operator of the press is responsible for changing the print sleeves, aligning the new print sleeve, and any necessary cleaning of the printing area.



Typical position of a press operator changing a print sleeve.

11.

XSYS, a large manufacturer of bridges and sleeves for flexographic printing presses, has manufactured and sold TC Transcontinental bridges and sleeves for years.

12.

In recent years, XSYS has manufactured and sold TC Transcontinental products such as the "Rotec Atlas CFX Airo" bridge, "Rotec High Performance Sleeve," "Rotec Premium Blue Light Sleeve," and similar products.



Promotional material for XSYS's "Rotec CFX Airo" bridge.

13.

The XSYS bridges use a pressurized air system that passes air from the press through the bridge to aid in the printing process. The bridges also include a heavy aluminum "blank" end piece at the end to the bridge.



Metal blank end cap of an XSYS bridge with the mandrel visible inside.

14.

On October 13, 2021, a defective XSYS bridge injured Mr. Freemon while

he was working at the Transcontinental printing facility in Griffin, Georgia.

During a printing job and unknown to anyone working at the printing facility, the

core of the XSYS bridge became overpressurized with compressed air, likely when

an internal air tube became dislodged and began filling the core of the bridge with

air.  The XSYS design did not include a relief valve, pressure indicator, or a simple

hole to avoid overpressurization of its core.  After a print job, Mr. Freemon went to

clean the press and to set it up for the next print run.  As he was leaning in to the

press with his face just a few inches from the XSYS bridge, the overpressurized

bridge exploded, launching the metal end cap from the bridge into Mr. Freemon's face and chest.

15.

The impact knocked Mr. Freemon unconscious for several minutes and caused severe injuries to his face and chest.  Mr. Freemon lost several teeth, broke both his upper and lower jaw, broke his sternum, and bruised his heart and lungs.

16.

Mr. Freemon was rushed to the local hospital by ambulance, then airlifted to Wellstar North Fulton for further treatment.  He was later discharged from the hospital, but the full scope of his recovery and future medical needs have not yet been fully determined.  To date, he still has not been cleared to lift more than five pounds and suffers from intense pain from his injuries.

17.

A photo taken after the incident shows the XSYS bridge with its end cap ejected.



XSYS bridge that injured Mr. Freemon, as found after with its end cap ejected.

18.

After Mr. Freemon's injury XSYS recommended that all its customers immediately stop using XSYS bridges.  TC Transcontinental followed that direction and shut down production on its printing presses using XSYS bridges. The shutdown included the five TC Transcontinental printing facilities in Griffin, Georgia; Ontario, California; Tomah, Wisconsin; Clinton, Missouri; and Montreal, Québec.

19.

XSYS personnel came to the Transcontinental facility in Griffin to investigate on October 14 and 15.  In light of its own investigation, XSYS determined that its bridge caused the October 13 incident that injured Mr. Freemon.  XSYS further acknowledged through its attorneys that the printing press that Mr. Freemon was working on at the time of the explosion was in good working order and not the cause of the explosion.

20.

In communications with TC Transcontinental, XSYS also confirmed that Mr. Freemon's injuries were caused by a defect in the bridge's design and that defective design was in all similar XSYS bridges use at TC Transcontinental's facilities.

21.

Following its own investigation, TC Transcontinental suggested a physical modification to XSYS's bridges to prevent future injuries.  Specifically, TC Transcontinental proposed that XSYS drill holes into the end caps of each bridge to allow air to escape and prevent the bridges' internal cavities from becoming overpressurized while in use.  Such holes are standard features on similar bridge products sold by XSYS's competitors.

22.

Having acknowledged responsibility for Mr. Freemon's injuries and the need for TC Transcontinental to stop using XSYS bridges with this design in its printing presses, XSYS agreed with TC Transcontinental's suggestion that holes be drilled into the XSYS bridges and created engineering drawings modifying the bridges to add such holes.  XSYS sent the drawings to TC Transcontinental and asked TC Transcontinental to make the modifications.

23.

TC Transcontinental rejected that request because, in TC Transcontinental's view, XSYS was responsible for making the modifications and providing safety warranties on the modified bridges.  Transcontinental informed XSYS that it is XSYS's responsibility to perform the modifications and to provide warranties of safety on the modified bridges.  Ultimately, XSYS agreed to perform the modifications itself.

24.

Over several weeks, XSYS modified the defective bridges it had sold to TC Transcontinental.

25.

During the bridge modification process after Mr. Freemon's injuries, TC Transcontinental requested a warranty from XSYS that the proposed bridge modification would eliminate the risk that XSYS bridges would overpressurize and explode causing more serious injuries to TC Transcontinental's employees or damage to TC Transcontinental's infrastructure.

26.

XSYS and TC Transcontinental struggled for months to reach an agreement about the XSYS warranty language for the modified bridges.  In December 2021 XSYS relented and warranted that its modification made the bridges, finally, safe for use.

**LIABILITY OF XSYS**

**COUNT ONE: STRICT LIABILITY OF XSYS**

27.

Mr. Freemon incorporates by reference the preceding paragraphs.

28.

XSYS is strictly liable under O.C.G.A. § 51-1-11 and other applicable law for the injuries suffered by Mr. Freemon because the risks inherent in the design of the XSYS bridge outweighed the utility of the chosen design, thereby rendering the

product defective, unreasonably dangerous, and not reasonably suited to the use for which it was intended.  The defects in the XSYS bridge design include the following:

(a)     The XSYS bridge did not include any sort of mechanism, such as a hole or relief valve, that would allow excess compressed air to escape if the bridge became overpressurized, thereby causing the end cap to fire like a missile into the face of an unsuspecting person—Mr. Freemon, here—working on the printing press.

(b)     XSYS did not adequately test the bridge to determine whether foreseeable users would be exposed to unreasonable risks of physical harm in foreseeable explosions because of overpressurization caused by the lack of any sort of mechanism, such as a hole or relief valve, that would allow excess compressed air to escape.

(c)     XSYS knew, or should have known, from tests performed on the bridge and other products designed for the same or similar purpose that the bridge's design would fail to properly protect foreseeable users of the printing press.

(d)     XSYS knew, or should have known, from basic engineering principles, the laws of physics, and other real-world incidents that its

design would fail to perform properly in foreseeable
overpressurization scenarios.

(e)   XSYS failed to warn foreseeable users, like Mr. Freemon, of the
dangers of the XSYS design even though XSYS was aware of those
dangers.  Mr. Freemon was totally unaware of the dangers posed by
the bridge which were hidden from Mr. Freemon and TC
Transcontinental, and the very dangers about which XSYS failed to
warn caused Mr. Freemon's injuries.

29.

The defects described above proximately caused Mr. Freemon's injuries and
damages.

**COUNT TWO: NEGLIGENCE OF XSYS**

30.

Mr. Freemon incorporates by reference the preceding paragraphs.

31.

XSYS, as a product designer and manufacturer, owed a duty to exercise
reasonable care to design, test, manufacture, inspect, market, and distribute a
product free of an unreasonable risk of harm to foreseeable users in foreseeable
situations.

32.

When XSYS designed, tested, manufactured, inspected, marketed, distributed, and sold the bridge, XSYS could have reasonably foreseen and likely did foresee the possibility that a bridge could become overpressurized, as described in this Complaint, and that overpressurization could cause catastrophic results without some method of relieving the air pressure within the bridge.

33.

XSYS breached its duty of reasonable care as described in the preceding paragraphs.

34.

XSYS's negligence proximately caused Mr. Freemon's injuries and damages.

**COUNT THREE: FAILURE TO WARN AGAINST XSYS**

35.

Mr. Freemon incorporates by reference the preceding paragraphs.

36.

As a manufacturer of products distributed and sold to the public, XSYS has a duty to adequately warn the public of and to remedy unreasonably dangerous conditions in its products.

37.

XSYS's decisions to not convey an adequate warning to foreseeable users of the dangerous conditions in the bridge and to not remedy those conditions rendered the XSYS bridge defective and unreasonably dangerous to foreseeable users.

38.

XSYS failed to warn foreseeable users adequately of and failed to remedy the known defective and unreasonably dangerous conditions in the XSYS bridge, thereby breaching its duty and obligation to foreseeable users, including Mr. Freemon.

39.

XSYS's failure to warn foreseeable users adequately of the known defective and unreasonably dangerous conditions in the XSYS bridge and its failure to remedy those conditions proximately caused Mr. Freemon's injuries and damages.

**COUNT FOUR: PUNITIVE DAMAGES AGAINST XSYS**

40.

Mr. Freemon incorporates by reference the preceding paragraphs.

41.

XSYS acted with conscious indifference to the safety and well-being of foreseeable users as defined under O.C.G.A. § 51-12-5.1 in designing, testing,

manufacturing, inspecting, marketing, distributing, and selling the XSYS bridge because XSYS had actual knowledge of the safety risks described above.

42.

XSYS built the pressurized bridge with a solid metal end cap in the exact location where it would be pointed at a foreseeable users face without any pressure relief mechanism to prevent explosions and did not warn anyone of the danger.

43.

Defendant XSYS's misconduct was so egregious that it rises to the level of conscious indifference to the safety and well-being of foreseeable users.  That misconduct warrants the imposition of punitive damages against XSYS.

44.

Punitive damages should be imposed against XSYS.

**DAMAGES SOUGHT**

45.

Mr. Freemon incorporates by reference the preceding paragraphs.

46.

Mr. Freemon claims all damages proximately caused by the tortious acts and omissions of XSYS, for which XSYS is liable.

47.

Mr. Freemon claims and is entitled to recover the following damages:

(a)     all components of the mental, emotional, and physical pain and

        suffering Mr. Freemon endured upon impact and up until the present

        time;

(b)     all components of the mental, emotional, and physical pain and

        suffering Mr. Freemon will endure in the future;

(c)     past and future loss of enjoyment of life;

(d)     compensatory damages for all past and future economic damages,

        including medical bills, medical expenses, and other necessary future

        expenses;

(e)     compensatory damages for all past and future economic damages,

        including lost wages and income;

(f)     shock, freight, and terror experienced before, during, and after the

        impact; and

(g)     all other damages recoverable under Georgia law.

48.

Mr. Freemon also seek punitive damages to punish or deter XSYS pursuant

to O.C.G.A. § 51-12-5.1 and other applicable law.

## PRAYER FOR RELIEF

WHEREFORE Mr. Freemon pray for the following relief:

(a)   That summons issue requiring XSYS to appear as provided by law to

answer this Complaint;

(b)   That service be had upon defendants as provided by law;

(c)   That Mr. Freemon have and recover all damages for all losses

compensable under Georgia law;

(d)   That punitive damages be imposed against XSYS;

(e)   That all expenses of litigation, including attorneys' fees, be cast

against XSYS; and

(f)   For such other and further relief to which Mr. Freemon may be

entitled at law or equity, as the Court shall deem just and appropriate.

Respectfully submitted on March 29, 2022.

CANNELLA SNYDER LLC

/s/ Robert H. Snyder, Jr.
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
RORY A. WEEKS
  Georgia Bar No. 113491
  rory@cannellasnyder.com
315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030

(404) 800-4828
(404) 393-0365 (fax)

***Attorneys for Plaintiff Laquez
Freemon***

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the

foregoing filing complies with the applicable font and size requirements and is

formatted in 14-point Times New Roman font.

CANNELLA SNYDER LLC

*/s/ Robert H. Snyder, Jr.*
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
RORY A. WEEKS
  Georgia Bar No. 113491
  rory@cannellasnyder.com
315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)